# *UNITED STATES MAGISTRATE JUDGE*
# *U.S. DISTRICT COURT BUILDING*
# *WASHINGTON, D.C.*

PLEASE ISSUE:  ☐ Arrest   ☑ Search   ☑ Seizure

warrant for:        INFORMATION ASSOCIATED WITH ONE CELL PHONE ACCOUNT
                    STORED AT PREMISES CONTROLLED BY AT&T CORPORATION
                    PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF
                    VIOLATION(S) OF 18 U.S.C. § 1752(a), 18 U.S.C. § 231, 18 U.S.C. §
                    111 &  40 U.S.C. § 5104

Violation:   ☐ D.C.C.   ☑ U.S.C.          Title:  18

Section(s):   18 U.S.C. § 1752(a); 18 U.S.C. § 231, 18 U.S.C.  § 111, 40 U.S.C. §  5104

/s/ Luke Jones
_____            March 25, 2021
Luke Jones                                  _____
Assistant United States Attorney            Date

COMPLETE FOR ALL ARREST WARRANTS:

*The following information <u>must</u> be provided for <u>ALL</u> arrest warrants and an **original** and*
***duplicate** of this form must be submitted to the Clerk's Office with the warrant papers.*

Officer / Agent Name:    Clay Zotz

Badge Number:    28-51916

Agency / Unit:    FBI Task Force Officer

24 Hour Telephone Number:    281-785-6796
 (For officer/agent)

Cellular Number:    281-785-6796
 (For officer/agent)

# UNITED STATES DISTRICT COURT

for the

District of Columbia

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE CELL PHONE ACCOUNT<br>STORED AT PREMISES CONTROLLED BY AT&T CORPORATION<br>PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION(S)<br>OF 18 U.S.C. § 1752(a), 18 U.S.C. § 231, 18 U.S.C. § 111 & 40 U.S.C. § 5104 | )<br>)<br>)   Case No. 21-sc-1008<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A hereby incorporated by reference.

located in the _____Northern_____ District of _____Texas_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1752(a) | Entering or remaining in any restricted building or grounds without lawful authority |
| 18 U.S.C. § 231 | Civil Disorder |
| 18 U.S.C. § 111 | Assault on a Federal Officer |
| 40 U.S.C. 5104( | Unlawful entry and disorderly conduct in a Capitol building and parading, demonstrating, or picketing |

The application is based on these facts:

See attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Clay Zotz, FBI Task Force Officer
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date: _____03/25/2021_____

_____
*Judge's signature*

City and state: ___Washington, D.C.___

Zia M. Faruqui, U.S. Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  21-sc-1001 |
| INFORMATION ASSOCIATED WITH ONE CELL PHONE ACCOUNT | ) | |
| STORED AT PREMISES CONTROLLED BY AT&T CORPORATION | ) | |
| PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION | ) | |
| (S) OF 18 U.S.C. § 1752(a), 18 U.S.C. § 231, 18 U.S.C. § 111 &  40 U.S.C. | ) | |
| § 5104 | | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____Texas_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment B hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____April 8, 2021_____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____U.S. Magistrate Judge Zia M. Faruqui_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:  ___03/25/2021_____

_____
*Judge's signature*

City and state:  __Washington, D.C._____

___Zia M. Faruqui, U.S. Magistrate Judge___
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-sc-1001 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____


_____
*Executing officer's signature*


_____
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with the AT&T Corporation account(s) identified by 425-588-8360 (the "Account") and which is stored at premises owned, maintained, controlled, or operated by AT&T Corporation, a wireless telephone service provider headquartered in Dallas, Texas.

**ATTACHMENT B**

**Particular Things to Be Seized and
Procedures to Facilitate Execution of the Warrant**

I.   **Information to be Disclosed by the AT&T Corporation ("PROVIDER") to
     Facilitate Execution of the Warrant**

To the extent that the information described in Attachment A is within the possession,
custody, or control of PROVIDER, including any records that have been deleted but are still
available to the Provider or have been preserved pursuant to a request made under 18 U.S.C.
§ 2703(f), the Provider is required to disclose to the government the following information
pertaining to the Account listed in Attachment A:

   a.   The following information about the customers or subscribers of the Account:

        i.   Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business
             addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned
             network addresses (such as Internet Protocol ("IP") addresses) associated
             with those sessions;

        v.   Length of service (including start date) and types of service used;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic
             Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"),
             Mobile Equipment Identifier ("MEID"); Mobile Identification Number
             ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber
             Integrated Services Digital Network Number ("MSISDN"); International
             Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile
             Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet
             Protocol ("IP") address); and

        viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. For the time period from November 3, 2020 through the present: All records and other information relating to wire and electronic communications sent or received by the Account, including:

      i.   Records of the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers ("call detail records"), email addresses, and IP addresses) including all available web browsing history, to include history both with and without location information and text messaging history, to include cell site locations and sectors for all outgoing and incoming voice,;

      ii.   Information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received; and,

      iii.   Records and information regarding Network Event Location Services (NELOS), including all available NELOS reports.

c. For the time period from November 3, 2020 through the present: The contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as voice call services, voice mail, text messaging, SMS, instant messaging or chat services, or picture and imaging sharing services), including but not limited to incoming, outgoing, and draft calls, chats, messages, and other electronic communications; attachments to communications (including native files); source and destination addresses and

header or routing information for each communication; the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);

d. For the time period from November 3, 2020 through the present: The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as voice call services, instant messaging or chat services, or remote computing services), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as voicemail, text and SMS messages, contacts, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

e. All records pertaining to devices associated with the Account, including the names and phone numbers associated with other devices on the subscriber's plan, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

TFO Clay Zotz
Federal Bureau of Investigation
3000 Briarcrest, Suite 306
Bryan, Texas  77802
cjzotz@fbi.gov

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence, instrumentalities, fruits, and contraband of Unlawful Entry – Restricted Building or Grounds, in violation of   Title 18 U.S.C. § Civil Disorder, in violation of 18 U.S.C. § 231, Assault on a Federal Officer, in violation of 18 U.S.C. § 111, and  Violent Entry and Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104   Injuries to Property, weapons, and violent entry/disorderly conduct on Capitol grounds as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence concerning the riot that occurred at the U.S. Capitol on January 6, 2021;

(b)  Information that constitutes evidence of data that places the user inside the U.S. Capitol on January 6, 2021;

(c) Information that constitutes evidence of any planning and preparation that the user of the account undertook prior to committing the criminal activity under investigation;

(d) Information that constitutes evidence of any steps that the user of the account took to disguise or hide their participation in the criminal activity under investigation;

(e) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(f) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(g) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner; and,

(h) The identity of any person(s) who communicated with the account about matters relating to the events of January 6, 2021, including records that help reveal their whereabouts.

## III.    Government Procedures for Warrant Execution

The United States government will conduct a search of the information produced by PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of

the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE CELL PHONE ACCOUNT STORED AT PREMISES CONTROLLED BY AT&T CORPORATION PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION(S) OF 18 U.S.C. § 1752(a), 18 U.S.C. § 231, 18 U.S.C. § 111 & 40 U.S.C. § 5104** | **SC No. 21-sc-1008**  **Filed Under Seal** |

*Reference:*      *USAO Ref. # 2021R00162; Subject Account(s): 425-588-8360*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Clay Zotz, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for certain location and related information associated with one cellular telephone account(s) assigned the phone number(s) 425-588-8360 ("the SUBJECT PHONE NUMBER"), that is stored at premises controlled by AT&T Corporation ("PROVIDER"), a cellular service provider headquartered in Dallas, Texas.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a commissioned peace officer with the Texas Department of Public Safety, and have been since March 27, 2009. For six years and five months, I have been assigned to the Texas Department of Public Safety Criminal Investigations Division as a Special Agent. Prior to that, I was assigned to the Texas Highway Patrol Division and carried the title of State Trooper for five years and seven months. I am currently assigned to the Federal Bureau of Investigation's (FBI)  Joint Terrorism Task Force (JTTF) and have been assigned to JTTF for approximately seven months. In my current position, I am charged with investigating violations of Federal law and the laws of the State of Texas, concentrating on violations of criminal law. Over the course of my law enforcement career, I have conducted long term investigations that have resulted in the arrest and conviction of persons, the seizure of narcotics and other evidence, as well as the seizure of currency determined to be contraband. I have performed in an undercover capacity and utilized cooperating individuals to further these investigations. I have drafted and executed numerous search and arrest warrants, including numerous cellular telephone search warrants, that resulted in the seizure of contraband and the prosecution of defendants.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the user of the SUBJECT PHONE NUMBER is ADAM MARK WEIBLING ("WEIBLING"), and that WEIBLING has committed Unlawful Entry – Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a),  Civil Disorder, in violation of 18 U.S.C. § 231,  Assault on a Federal Officer, in violation of 18 U.S.C. § 111, and Violent Entry and

2

Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104.   There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### *Background*

6.      United States Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 on January 6, 2021.

### *The 2020 United States Presidential Election and the Official Proceeding on January 6, 2021*

7.      The 2020 United States Presidential Election occurred on November 3, 2020.

8.      The United States Electoral College is a group required by the Constitution to form every four years for the sole purpose of electing the president and vice president, with each state appointing its own electors in a number equal to the size of that state's Congressional delegation.

9.      On December 14, 2020, the presidential electors of the U.S. Electoral College met in the state capital of each state and in the District of Columbia and formalized the result of the

2020 U.S. Presidential Election: Joseph R. Biden Jr. and Kamala D. Harris were declared to have won sufficient votes to be elected the next president and vice president of the United States.

10.     On or about December 19, 2020, President Donald J. Trump tweeted, "Statistically impossible to have lost the 2020 Election.  Big protest in D.C. on January 6th.  Be there, will be wild!"

11.     On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate ("the Joint Session") convened in the United States Capitol building (the "Capitol" or the "U.S. Capitol") to certify the vote of the Electoral College of the 2020 U.S. Presidential Election (the "Certification").

### *Criminal Activity Before the Riot*

12.     Based on my knowledge, training, and experience, I know that participants in the kinds of criminal activities described herein tend to, and often did here, take certain preparatory steps before committing their crimes, including: researching and purchasing materials and supplies such as burner phones, tactical vests and helmets, and weapons including bear spray, pepper spray, asps (police batons), guns and ammunition, and zip tie restraints; mapping and reconnoitering the location of the planned crime and possible entry and escape routes, including checking for surveillance cameras and other potential security surrounding such locations; training in how to use their weapons and other tools and techniques involved in their planned criminal activity; and organizing with other co-conspirators on social media and elsewhere for planned travel and methods of attack.

13.     Beginning after the election in November 2020, text and other communications show that some groups of subjects planned and attended military-style training in preparation for opposing the results of the election.  Multiple groups that forcibly entered the Capitol appeared to

consist of individuals who had practiced and/or coordinated their actions.  Some groups at the riot included members who dressed in similar uniforms with the same insignia, and members of some groups can be heard on video giving and following instructions.  Based on my training and experience, and this investigation, these groups' manner of dress, movements, and communication demonstrate that they had prepared together.  Furthermore, the movement of these groups within the Capitol demonstrates an intent to, among other things, oppose by force Congress's authority, and to prevent, hinder, or delay the execution of the Joint Session's legal responsibilities.

14.     Beginning in December 2020, using social media, text messaging, and messaging applications, subjects planning to participate in the riot sent incendiary messages aimed at recruiting as large a following as possible to go to Washington, D.C. to interfere with the official Congressional proceeding on January 6, 2021.

The investigation has shown that many of the subjects of this investigation came from out of state and coordinated using social media, text messaging, and messaging applications on their cell phones.  Using these tools, they coordinated their travel and other activities, including discussing what gear and weapons to bring and their plans to overrun the Capitol and take hostages. During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and helmets.  The common equipment and paraphernalia that groups inside and outside the Capitol possessed, such as bear spray, eye protection, tactical vests, and helmets, are evidence of some prior agreement among individuals to engage in the conduct described herein.

### The Riot at the U.S. Capitol on January 6, 2021

15.     At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to

south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

16.     The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

17.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

18.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.   During  the  joint  session,  elected  members  of  the  United  States  House  of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020.  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

19.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the

exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

20.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

21.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.

22.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

23.     At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

24.     Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others

in the crowd encouraged and assisted those acts.   Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



A Reporter's Footage from Inside the Capitol Siege

we're gonna fucking take this [indistinct].

1:16/12:32

25.     Multiple groups that forcibly entered the Capitol appeared to consist of individuals who had practiced and/or coordinated their actions.   For example, some groups included members who dressed in similar uniforms with the same insignia, and members of some groups can be heard on video giving and following instructions.   Based on my training and experience, and this investigation, these groups' manner of dress, movements, and communication demonstrate that they had prepared together.   In addition, the equipment and paraphernalia that groups inside and outside the Capitol possessed, such as flex cuffs, bear spray, eye protection, and helmets, are evidence of some prior agreement among individuals to engage in the conduct described herein.   Finally, the movement of these groups within the Capitol demonstrates an intent to, among other

things, oppose by force Congress's authority and to prevent, hinder, or delay the execution of the Joint Session's legal responsibilities

26.     Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.  USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

27.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the federal police officers were injured and several were admitted to the hospital.

28.     The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and police batons and used them against law enforcement officers trying to protect the U.S. Capitol and the people who were legitimately inside it.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

29.    Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

30.    At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

31.    At around 2:47 p.m. EST, subjects broke into the United States Senate Chamber. Publicly available video on the news media website of The New Yorker shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



32.    After subjects forced entry into the Senate Chamber, the same publicly available video shows that an individual asked, "Where the fuck is Nancy?" Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



33.     A subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter on the same video, stated, "Its Only A Matter of Time Justice is Coming."



34.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

35.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

36.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

37.     At around 4:52 p.m. EST, at a staging area for the media set up outside of the U.S. Capitol building on the east side, unknown subjects assaulted members of the media and stole and destroyed equipment owned by various members of the media and media companies.

38.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

39.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm EST after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

40.     Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

41.     Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

42.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. EST on January 7, 2021.

12

### *Cell Phone Usage at the Riot*

43.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.  Subjects also posted comments, pictures, and video before, during, and after breaching the Capitol grounds and the Capitol building.

44.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to coordinate with other participants at the gatherings, to communicate with other individuals about the gatherings, to allow individuals to capture photographs and video footage of the gatherings, and to post on social media and digital forums about the gatherings.

45.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

46.     Photos available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos.

13

47.     In addition, organized groups within the rioters used social media, text messaging, and messaging applications and other apps on their cell phones to plan and coordinate their activities before, during, and after the riot.

## Criminal Activity After the Riot

48.     Following the riot, many subjects posted pictures, video, and texts showing and describing their participation in the riot.  These included selfies and videos apparently taken with their personal cell phones.  Some subjects also posted plans for similar future activity, such as taking over state capitols.  Many of these posts were subsequently deleted.  In addition, according to records provided by Google, some people who were in or near the U.S. Capitol building during the riot subsequently deleted their Google location history or their Google accounts altogether after January 6, 2021.  I know from my knowledge, training, and experience that people who commit criminal acts will often delete such information in an attempt to thwart any subsequent criminal investigation.  Some subjects subsequently fled their homes and went into hiding.  Some also discussed going into hiding and hiding the gear that they used in the riot over text messages.

## Facts Specific to This Application

49.     According to records obtained through a search warrant served on AT&T Corporation, on January 6, 2021, at or about the time of the incident described above, that is, 7:26:50 p.m. UTC time (3:26:50 EST), the cellphone associated with number 425-588-8360 was identified as having used a cell site consistent with providing service to a geographic area that includes the interior of the United States Capitol building. Your affiant is aware that the riots at the United States Capitol took place over the course of several hours. This is approximately the time that law enforcement officers were clearing the Senate floor, as described above.

14

50.     According to records provided by PROVIDER, the SUBJECT PHONE NUMBER is also associated with the following device identifiers: a Subscriber Identity Module ("SIM") 89014104279576189864   and   an   International   Mobile   Subscriber   Identifier   ("IMSI") 310410957618986.

51.     On January 19, 2021, FBI Houston received a lead from FBI Washington Field Office indicating that one of the participants in the riot was WEIBLING. Your affiant was provided with photographs and various video clips posted on YouTube of the riot. Your affiant reviewed the media and confirmed the similarity of the individual and WEIBLING.

52.     Your affiant ran a check on WEIBLING through law enforcement databases and observed that WEIBLING holds a current driver license out of the state of Washington and also has an expired driver license through the state of Texas. Your affiant knew what WEIBLING looked like from the photograph on WEIBLING's current Washington State Driver License and the photograph on WEIBLING's expired Texas Driver License. Later that same day, your affiant was made aware that there was video footage of WEIBLING in a video on The New Yorker. Your affiant observed that the subject identified as WEIBLING appeared in the video from roughly the 2 min and 58 second mark through the 3 minute and 10 second mark. The subject wore a white collared shirt with a brown suede jacket. The subject was approximately 5'7" and 170 pounds. Your affiant observed that the subject believed to be WEIBLING bore a striking similarity to the individual in WEIBLING's current Washington State Driver License. The video from The New Yorker can be viewed at URL newyorker.com/news/video-dept/a-reporters-footage-from-inside-the-capitol-siege.

15



53.    In the video, the subject enters the Capitol building and engages with what is presumed to be a USCP Officer.  During the encounter, the officer, clad in riot gear, attempts to hold back the subject and others from entering any further into the building. The subject holds his hands up and continues to engage verbally with the officer. Photography of the event depicts the subject on the steps of the U.S. Capitol as well as inside the U.S. Capitol building itself.

54.    Footage of U.S. Capitol Building surveillance cameras from January 6, 2021, obtained from USCP and viewed by your affiant shows that at approximately 2:39 pm EST, the same subject engaged with an unidentified USCP officer to force entry into the building. Once the subject breached the Capitol, he struggled with the officer for approximately 90 seconds before wandering into the Rotunda at around 2:42 p.m EST. The subject appeared disheveled from the encounter throughout the rest of the footage, often placing his hand on head to as if

16

checking for a wound.  In the rotunda, the subject interacted with several protestors before

leaving the momentarily and then returning. At approximately 2:49 p.m., the subject left the

rotunda, leaving toward the North Exit and moving into the Old Senate Chamber hallway area.



55.     At 2:55 p.m., the subject returned to the Rotunda, where he stayed for

approximately fifteen minutes. During that time, the subject used a cellphone – clearly visible on

video – while interacting with other protestors. As the Police Officers took control of the crowd,

the subject exited the rotunda toward the main Rotunda entrance, and, at approximately 3:12

p.m., left the U.S. Capitol Building.



56.     Flight records obtained on January 29, 2021 from America Airlines confirm

WEIBLING was in the Washington D.C. area on January 6, 2021. WEIBLING traveled on an

outbound flight from Dulles International Airport, Virginia, on January 7, 2021 with a layover in

Charlotte, North Carolina, in route to Houston International Airport.  In addition, your affiant

reviewed social media posts made between December 22, 2020 and January 15, 2021 on the

social media website Twitter.  WEIBLING was an active participant on the site, generally

replying to other users or retweeting – otherwise described as sharing other users posts on their

page that can be viewed by the sharing party's followers – on a frequent basis. WEIBLING used

the Twitter account handle @AdamWeibling. Analysis of WEIBLING's tweets between the

aforementioned periods indicated WEIBLING's skepticism in the results of the election,

discontent with Congress, and intention to travel to Washington D.C. to participate in the

January 6, 2021 pro-Trump protest.

57.     WEIBLING consistently tweeted about a rigged or stolen election and how the incoming President-Elect was a puppet. As far back as November 6, 2020, the day his account was created, WEIBLING complained about election irregularities. In tweets to @DevinNunes on November 6, 2020, WEIBLING posted, "your silence on voter fraud and irregularities and lack of transparency is deafening right now.  On November 13, 2020 he posted, "#stopthesteal," in response to a now deleted post by @realDonaldTrump.  To @Ksorbs on November 15, he tweeted: "#electonfraud2020." In tweets to @Eric Trump on December 2 at 7:09 p.m., WEIBLING posted "Everyone who cares about elections not being rigged, who want to live in a free country, should be outraged! To @dbongino at 10:47 p.m. the same day, he posted "It's not a free country if 3 letter agencies, rogue governments and crooked swamp dwellers can install whoever they want…."

58.     On December 22, 2020 WEIBLING voiced discontent with Congress, tweeting to a user "We need term limits, or better yet just march on DC, tar and feather whoever we can find in the damn congress and start over."



59.     WEIBLING reiterated this distaste when replying to another user, "People need to rise up, we are being ruled and used by the so called "elite. [sic] It only stops when we MAKE it stop." In reply to @ksorbs'December 18, 2020  post regarding the necessity of AR-15s, WEIBLING responded the same day, "To fight the government, that's what the second amendment is for. To resist Tyranny. …Resistance IS possible, look at the countries and wars that don't end…"



60.     WEIBLING posted about his prior activities in protesting the November 3, 2020 election results. In a reply to @ali, whose account has now been suspended, WEIBLING posted about his activism, "Thank you, Wife and I are traveling to events, donating and calling, emailing etc…." @ali was the username of Ali Alexander, the main leader of the StopTheSteal movement.

61.     WEIBLING committed early on to be at the January 6, 2021 protests. Replying to a tweet posted on December 23, 2020 by Twitter user @Cernovich - @Cernovich asked who would be present on the January 6 protest - WEIBLING replied, "Count my wife and I in." WEIBLING's wife was Brittney Weibling. Your affiant knew that Brittney Weibling was WEIBLING's wife due to records your affiant obtained through law enforcement databases that indicated that the two were married.

21



62.     WEIBLING further indicated his intention to travel to Washington D.C. on December 28, 2020. @Cernovich asked his own followers if he (that being @Cernovich) should attend the protest. WEIBLING responded, "Absolutely, see you there." On January 2, 2021, WEIBLING replied to Twitter user @AbbyJohnson, who expressed interest in traveling to Washington D.C., "See you there I hope." FBI Agent Paul Poston, who is working on conjunction with your affiant, obtained a search warrant for WEIBLING's Twitter account on February 8, 2021. From the search warrant, your affiant  learned that the telephone number associated with the Twitter account is 425-588-8360.

63.     Your affiant was also able to view Brittney Weibling's Facebook account, where Brittney Weibling has several photographs of herself and WEIBLING posted. In the photographs, the individual who appears with Brittney Weibling, who is believed by your affiant to be WEIBLING, bears a striking resemblance to the individual observed in the footage of U.S. Capitol Building surveillance cameras from January 6, 2021 as discussed above.

64.     Your affiant also ran a check on WEIBLING through law enforcement databases and determined that the cellular telephone number 425-588-8360 is associated with WEIBLING. A check of law enforcement databases revealed that 425-588-8360 is serviced by the cellular telephone carrier AT&T. A subpoena return obtained by your affiant on the above cellular telephone number and served on AT&T for subscriber information revealed that the "user information" on said cellular telephone is attributed to ADAM M. WEIBLING at 4029 Williams Ave N, Rendon, Washington 98056.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

65.     PROVIDER is the provider of the cell services for the SUBJECT PHONE NUMBERS.

66.     PROVIDER is a company that provides cellular telephone access to the general public.  As part of the provision of such access, PROVIDER gives its users a cell phone number, voice mail, cell service based text messaging, SMS messaging, the ability to share pictures and video, and cell service based access to the internet.  As part of its regular business practices, PROVIDER stores information about the use of these services and their contents for varying periods of time depending on the service.

67.     Wireless providers such as PROVIDER can provide cell service to more than one phone as part of a package, so that the SUBJECT PHONE NUMBER may be associated with other phones that are paid for by the same subscriber.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account and/or who may have conspired with the user of a particular PROVIDER account.

23

68.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including Media Access Control address ("MAC" address), an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that cell service providers like PROVIDER retain records of the unique identifiers of their subscribers' cell phones and other devices.

69.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

70.     Wireless providers such as PROVIDER typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.

71.     Wireless providers such as PROVIDER typically collect and retain information in their normal course of business about their subscribers' use of PROVIDER's services, including records about calls, text messages, SMS messages, pictures and video or other communications sent or received by a particular device, such as the source and destination telephone numbers ("call detail records"), email addresses, and IP addresses, and other transactional records.  These records may include the contents of such communications.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE NUMBER's user or users and who they communicated with and when.

72.     Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider typically stores: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

73.     I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers may

25

be a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

74.     Based on my training and experience, I know that PROVIDER also collects Per-Call Measurement Data ("PCMD").  PCMD estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.  This location information by this provider is known as "NELOS."   Given the limits of the antenna compared to cell towers, this information is likely to be even less reliable than it is when collected by traditional cell towers.  AT&T's NELOS information can provide an approximate location of the cellular device using a combination of timing advance, Wi-Fi, and global positioning information (GPS).  At times, this information can supplement cell site data when no call or text information is available.

75.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications, as well as PROVIDER-generated information about its subscribers and their location and use of PROVIDER services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

76.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal

conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, text messages, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by PROVIDER can show how and when the account was accessed or used. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail).  Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation.  For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[1]

77.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries,

---

[1] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because phones and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

78.     In my knowledge, training, and experience, I know that criminals sometimes use "burner" phones, or cheap disposable prepaid mobile phones when preparing for and committing their crimes.  "Burner" phones are mobile phones for which credit is purchased in advance of service use.  Burner phones can be bought with cash and with no contract, plus providers that sell these devices often don't track personal data.  Burner phones often use a mobile virtual network operator that has agreements with companies like PROVIDER to access cell service, therefore, burner phone records may be included in the information stored by PROVIDER.

79.     In my knowledge, training, and experience, I have learned that it is often beneficial to review at least 60 days of cell phone records on either side of a criminal event because they will establish a pattern of life and behavior.  A smaller collection of records would make it difficult to

determine if it is unusual for the phone(s) to appear in the areas where these crime(s) occurred. Not only will this assist in determining if the phone(s) frequents the areas of the crime scene(s), but also whether the phone normally belongs in these areas because that is where the phone subscriber lives and/or works.

## AUTHORIZATION REQUEST

76.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

77.    I further request that the Court direct PROVIDER to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

80.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.  I submit that Assistant U.S. Attorney Luke Jones, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

78.    Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence of the Subject Offenses may be located with the records and information associated with the SUBJECT PHONE NUMBER described in Attachment A.

Therefore, I request that the Court issue the proposed search warrant to seize items described in Attachment B.

Respectfully submitted,

_____

Clay Zotz
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on March 25, 2021.

_____

ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

30

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE
## 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ (PROVIDER), and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of _____.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      The process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here, the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                     Signature